**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DOCUMENTED**, | |
| *Plaintiff,* | |
| **v.** | Case No. **21-cv-3142-RCL** |
| **DEPARTMENT OF HOMELAND SECURITY**, | |
| *Defendant.* | |

<u>**MEMORANDUM OPINION**</u>

Documented, a non-profit focused on immigration news and policy, submitted a Freedom of Information Act ("FOIA") request to the Department of Homeland Security ("DHS") in 2021. Dissatisfied with DHS's response, Documented initiated this lawsuit alleging that the agency unlawfully redacted certain records responsive to its request. DHS claims that each withholding was proper because the redacted portions, if disclosed, would reveal the agency's deliberative processes. Both parties have moved for summary judgment. For the reasons contained herein, the Court will **GRANT IN PART AND DENY IN PART** Documented's motion for summary judgment and will also **GRANT IN PART AND DENY IN PART** DHS's motion for summary judgment.

I.    **BACKGROUND**

Documented is a New York City-based nonprofit news organization that covers immigration policy and local news of interest to immigrants. Compl. ¶ 1, ECF No. 1. The Department of Homeland Security is the federal agency primarily responsible for border security, customs, and immigration. *See United States v. Sadig*, 271 Fed. App'x 290, 292 n.3 (4th Cir. 2007) (explaining the purview of DHS and three of its constituent components: the

Bureau of Immigration and Customs Enforcement, Bureau of Citizenship and Immigration Services, and Bureau of Customs and Border Protection).

Among DHS's many responsibilities, two are particularly relevant to this case.  First, the Secretary of Homeland Security may select countries for Temporary Protected Status (TPS) designation.  8 U.S.C. § 1254a.  An alien who is a national of a designated country may apply to U.S. Customs and Immigration Services for Temporary Protected Status which, if granted, allows that alien to remain and work in the United States.  *Id.* § 1254a(a)(1).  A country is eligible for designation if conditions in that country make it unsafe for its nationals to return, such as if the country is experiencing armed conflict, a natural disaster, or other "extraordinary and temporary conditions."  *Id.* § 1254a(b)(1).    Country designations are subject to periodic review and may be extended or terminated by decision of the Secretary of Homeland Security. *Id.* § 1254a(b)(3)(A)–(B).  If the Secretary does not make a decision to terminate or extend a country's TPS designation by the 60th day before its designation period is set to expire, the designation is automatically extended for a period of at least six months.  *Id.* § 1254a(b)(3)(C).[1]

Second, on and off from 2019 to 2022, DHS administered the Migrant Protection Protocols ("MPP"), a program under which the United States required nationals of certain countries who crossed the United States' southern land border without authorization to return to Mexico while awaiting removal proceedings.  Def.'s Reply 5, ECF No. 30; *Court Ordered Reimplementation of the Migrant Protection Protocols*, Dep't of Homeland Sec., https://www.dhs.gov/archive/court-ordered-reimplementation-migrant-protection-protocols  (last visited Sept. 3, 2024).  As part of this program, DHS signed contracts to establish immigration

---

[1] Although the authority to select countries for TPS designation was initially vested in the Attorney General, TPS became the purview of the Secretary of Homeland Security when the INS was abolished in 2003 and its immigration functions transferred to the newly created Department of Homeland Security.  *See* 8 U.S.C. § 1103; 6 U.S.C. § 112; 6 U.S.C. § 275.

hearing facilities at select ports of entry along the Mexican border.  Pls.' Mot. for Summ. J. 15, ECF No. 24; Defs.' Reply 5.  When sweeping lockdowns were implemented in response to the onset of the COVID-19 pandemic, some MPP facilities were placed in "warm status," meaning that operations and maintenance activities continued but immigration hearings were suspended. 1st Pavlik-Keenan Decl. ¶ 14, Def.'s Mot. for Summ. J. Attach. 3, ECF No. 22-3.

In January 2021, Documented submitted a FOIA request to the Department of Homeland Security, seeking all of the Secretary of Homeland Security's "Decision Papers" dating back to January 1, 2017.  Compl. ¶¶ 7–8.  DHS acknowledged the request and invoked its 10-day response deadline extension under FOIA, estimating that it would respond with a determination of Documented's request by February 24, 2021.  *Id.* ¶¶ 9, 11.  DHS had still produced no documents by December 2021, which led Documented to sue for declaratory relief, an injunction ordering DHS to disclose the requested records, and costs and attorney fees.  *Id.* ¶ 12.  However, since the lawsuit began, DHS processed Documented's request and made multiple document productions.  After working together to narrow the scope of the dispute, the parties now only contest DHS's decision to redact three records responsive to Documented's FOIA request.  Pl.'s Reply 3, ECF No. 45.

The first record in issue, the "Duke Honduras Memo," is a two-page memo from Acting Secretary Elaine Duke to L. Francis Cissna, Director of USCIS, and James Nealon, Assistant Secretary for International Affairs.  Duke Honduras Memo, Pl.'s Mot. for Summ. J. Ex. 2, ECF No. 24-2.  In it, the Acting Secretary explains that she needs more time to reach a decision as to Honduras's TPS designation and, as a result, the country's TPS designation would be automatically extended pursuant to 8 U.S.C. § 1254a(b)(3)(C).  *Id.*  The bottom of the first page is redacted.  According to DHS, the redacted portion details the Acting Secretary's consultations

with other agencies and DHS components that informed her choice to delay making a decision about Honduras's TPS designation, and describes "further action [the Secretary] wanted to take with the government of Honduras, which was not a basis for her decision."  2d Pavlik-Keenan Decl. ¶ 18, Def.'s Reply Attach. 1, ECF No. 30-1.  The second page of the memo expresses the Acting Secretary's intent to seek additional information before reaching a decision and to work with Congress to provide a more permanent solution for longtime TPS beneficiaries living and working in the United States.  Duke Honduras Memo 2.

The second contested record is the "Somalia TPS Memo."  This document is a memorandum from Mark Koumans, Deputy Director of USCIS, and Ken Cuccinelli II, the Acting Deputy Secretary of DHS, to the Acting Secretary of Homeland Security.[2]  Somalia TPS Memo, Pl.'s Mot. for Summ. J. Ex. 6, ECF No. 24-6.  The memorandum is almost entirely redacted, except for the agency's ultimate decision to extend Somalia's TPS designation by 18 months.  *Id.* at 11.  DHS represents that the document is a "memorandum . . . to consider various options on whether to extend or terminate Somalia's TPS designation," and that the withheld pages contain a "deliberation with underlying facts and discussions, and options and recommendations on Somalia's designation . . . ."  1st Pavlik-Keenan Decl. ¶ 23, Def.'s Mot. for Summ. J. Attach. 3, ECF No. 22-3.  DHS's supplemental *Vaughn* index further claims that the memo "provides factual background" on conditions in Somalia and "assisted the Secretary in understanding those facts to make informed, legally sufficient decisions in line with the Department's goals."  Supplemental *Vaughn* Index, Def.'s Reply Attach. 2, ECF No. 30-2.

---

[2] The Acting Secretary is not named in the memorandum, but based on the document's date of December 5, 2019, it was Chad Wolf.

The third disputed record, the "MPP Memo," is a memo from R.D. Alles, Deputy Undersecretary of DHS for Management, and Scott L. Gabe, Acting Under Secretary of the DHS Office of Strategy, Policy, and Plans, to the Acting Secretary of Homeland Security.[3]  MPP Memo, Pl.'s Mot. for Summ. J. Ex. 5, ECF No. 24-5.  This two-page memo provides information about the MPP facilities at Brownsville and Laredo, Texas, which had been placed in "warm status" in April 2020.  *Id.* at 1.  After explaining the costs and contractual obligations associated with these facilities, the memorandum provides the Acting Secretary with an analysis of potential "courses of action" for the agency to take with respect to these facilities, which are redacted.  *Id.* at 2.  The memo also contains a section explaining why the agency's ultimate decision between these options requires the signature of the Acting Secretary, which is also redacted.  *Id.*

For all three records, DHS claims that the redacted portions, if disclosed, would reveal the agency's deliberative processes.[4]  Def.'s Mot. for Summ. J. 10–14, 16–18, 19–21, ECF No. 22.  DHS has moved for summary judgment on this basis.  *See generally id.*  Documented has responded to DHS's motion with a cross-motion for summary judgment.  Pl.'s Mot. for Summ. J., ECF No. 24.  DHS has filed a response, Defs.' Reply, ECF No. 30, to which Documented has replied, Pl.'s Reply, ECF No. 34.  The cross-motions for summary judgment are now ripe for the Court's review.

---

[3] As with the Somalia TPS Memo, the MPP memo does not name the Acting Secretary, but based on the date of December 16, 2020, it was Chad Wolf.

[4] When the parties first filed their cross-motions for summary judgment, an additional three documents were disputed, and DHS claimed additional exemptions based on attorney-client and attorney work product privilege.  At present, DHS does not claim either of these privileges with respect to the records still contested.

## II.    LEGAL STANDARDS

### A.  Rule 56(a): Motion for Summary Judgment in the FOIA Context

To succeed on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material fact" is one which "might affect the outcome of the suit" according to the substantive law at issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant bears the initial burden of "identifying those portions of the record it believes 'demonstrate the absence of a genuine issue of material fact.'"  *White v. Wash. Nursing Facility*, 206 F. Supp. 3d 137, 143 (D.D.C. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the movant has made an adequate showing, summary judgment is granted unless the party opposing the motion "set[s] forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  Summary judgment is also appropriate if the party opposing the motion "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

"FOIA cases typically and appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  An agency is entitled to summary judgment in a FOIA dispute if it "demonstrates that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information."  *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (internal citation omitted).  Additionally, an agency that wishes to avoid

disclosing material by claiming a FOIA exemption must "show that release of [that] material would result in reasonably foreseeable harm." *Bagwell v. U.S. Dep't of Just.*, 588 F. Supp. 3d 58, 76 (D.D.C. 2022) (citing 5 U.S.C. § 522(a)(8)(A)(i)(I)).

"'[An] agency may meet [its] burden by filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed,' and by 'show[ing] how release of the particular material would have the adverse consequence that the Act seeks to guard against . . . .'" *Am. Oversight v. U.S. Dep't of the Treasury*, 474 F. Supp. 3d 251, 260–61 (D.D.C. 2020) (first quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 217 (D.C. Cir. 1987), then quoting *Wash. Post Co. v. U.S. Dep't of Just.*, 863 F.2d 96, 101 (D.C. Cir. 1988)). The agency may also use affidavits to demonstrate compliance with FOIA's segregability requirement, so long as those affidavits "show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008).

An agency's affidavits must be "reasonably detailed, non-conclusory, and submitted in good faith . . . ." *Nance v. FBI*, 845 F. Supp. 2d 197, 203 (D.D.C. 2012). However, they need not "provide so much detail that the purpose of the FOIA exemption is defeated." *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 149 (D.D.C. 2015) (citing *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). Rather, an agency's affidavits testifying to the adequacy of its search, its reasons for redacting information, and its efforts to segregate and disclose non-exempt materials are "'accorded a presumption of good faith,' forcing a FOIA plaintiff to rebut agency affidavits with something more than pure speculation." *Nance*, 845 F. Supp. 2d at 203 (quoting *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). In particular, "agencies are entitled to a presumption that they complied with their

obligation to disclose any reasonably segregable portion of a record," *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007) (quotations omitted), which the requester must present some "quantum of evidence" to overcome.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

**B.  FOIA Exemption 5**

FOIA permits the Government to withhold or redact records responsive to a FOIA request if the withheld information comprises "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ."  5 U.S.C. § 522(b)(5).  This exemption, known as Exemption 5, incorporates the protections of attorney-client privilege, attorney work-product privilege and, as relevant in this dispute, deliberative-process privilege.  *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for U.S. Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016).

Information is eligible for withholding under the deliberative-process privilege if it is "both 'predecisional' and 'deliberative.'"  *Petrol. Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).  "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made.'"  *Id.* (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).  Materials may be considered predecisional whether or not a final decision is ever actually reached.  *See Heartland All. for Hum. Needs & Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 78–79 (D.D.C. 2018) ("A document may be predecisional even if a final decision is never reached."); *Comptel v. FCC*, 910 F. Supp. 2d 100, 121 (D.D.C. 2012) ("Materials do not lose their predecisional status once a final decision is made.").

"Material is deliberative if it 'reflects the give-and-take of the consultative process.'" *Petrol. Info. Corp.*, 976 F.2d at 1434 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  The deliberative-process privilege typically protects opinions and excludes factual content, but "[t]he fact/opinion distinction . . . is not always dispositive; in some instances, 'the disclosure of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately held privileged."  *Id.* at 1434 (quoting *Mead*, 566 F.2d at 256).

## III.   ANALYSIS

### A.  The Unredacted Haiti Memo Located by Documented Is Irrelevant to This Dispute

As a preliminary matter, Documented has found—on a public docket pertaining to unrelated litigation—an unredacted version of a memo discussing Haiti's TPS designation.  Pl.'s Reply 1–3.  DHS disclosed an almost entirely redacted version of this memorandum to Documented earlier in this lawsuit.  *See* Haiti TPS Memo, Pl.'s Mot. for Summ. J. Ex. 4, ECF No. 24-4.  Based on a comparison between the version it received from DHS and the version found on the public docket, Documented believes that DHS too aggressively redacted the version that it sent to Documented.  Pl.'s Reply 3.  Although Documented is not requesting that DHS duplicatively produce a record already in its possession, Documented argues that this revelation is relevant for a different reason: it should cause the Court to view with heightened skepticism DHS's claims for deliberative-process privilege and its representations that it has made reasonable efforts to segregate non-exempt material.

Documented's find is simply not enough for the Court to abandon the usual presumption of good faith to which an agency is entitled in the FOIA context.  First, DHS's redaction of the Haiti TPS memo is no longer a live dispute in this litigation, as Documented concedes.  Pl.'s Reply 3 (acknowledging that three previously disputed records, including the Haiti TPS memo,

are "no longer practically at issue" in this case).  Therefore, it would be imprudent—and, arguably, an impermissible advisory opinion—for the Court to decide whether the unredacted version of the Haiti TPS memo exposes any unlawful redactions on DHS's part.  Second, and more importantly, even if the publicly available version of the Haiti TPS memo showed that DHS had been too aggressive in its redactions of that record, that isolated data point does little to suggest that DHS has *also* been too aggressive in redacting the records still disputed in this litigation.  As another court in this District has concluded, an agency's "withholding of portions of a record in [one] case that were produced in another case" does not constitute "evidence of bad faith," at least where the withheld pages do not "contain[] anything that the government would have a particular interest in hiding" and there is no evidence of "some nefarious scheme" to keep the documents from the requester.  *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 80 (D.D.C. 2020).  The Court will not impute such a "nefarious scheme" to DHS based on this single record, particularly since the discrepancies between the two versions of the Haiti TPS memo could be just as easily attributed to the differing circumstances preceding their disclosure. *See Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 359 (D.D.C. 2017) (noting that "FOIA exemptions are not coextensive with civil discovery standards").

Admittedly, "[f]ew cases in this Circuit address what constitutes bad faith, with most cases focusing on what is *not* bad faith."  *Khatchadourian*, 453 F. Supp. 3d at 79 (emphasis in original).  And it may be frustrating to Documented that, "[b]ecause FOIA requesters lack access to the withheld records, they will often be unable to 'rebut[] th[e] presumption'" of good faith to which an agency's segregability averments are entitled.  *Perioperative Servs. and Logistics, LLC v. U.S. Dep't of Veterans Affs.*, 57 F.4th 1061, 1069 (D.C. Cir. 2023) (quoting *Sussman*, 494 F.3d at 1117).  But this difficulty is a feature of FOIA, not a bug.  It embodies a fundamental

compromise inherent in the statutory scheme: requiring an overly detailed demonstration of compliance with FOIA's requirement would risk defeating "the purpose of the FOIA exemption[s]." *Bigwood*, 132 F. Supp. 3d at 149.  The Court need not muse about what it may take to surmount the presumption of good faith; it suffices to say the Haiti memo is not enough.

## B. The Honduras Memo is Partially Exempt from Disclosure Under Deliberative-Process Privilege

Documented argues that because the Duke Honduras Memo communicates the Acting Secretary's official decision to her subordinates, it constitutes "the quintessential dissemination of 'already-determined agency policy,'" which is not covered by deliberative-process privilege and therefore unprotected by FOIA Exemption 5.  Pl.'s Reply 4 (quoting *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 363 (D.C. Cir. 2021)).  Documented is partially correct.  According to DHS's representations, part of the redacted section of the memo discusses the Acting Secretary's reasons for her then-final decision to allow Honduras's TPS designation to automatically extend.  This discussion is not covered by the deliberative-process privilege. However, another part of the redacted section portends a future decision that the Acting Secretary had not yet made, and hints at the Secretary's decision-making process for that decision, content that may be properly withheld under FOIA Exemption 5.

"[D]ocuments reflecting a final agency decision and the reasons supporting it" are not protected by deliberative-process privilege.  *United States Fish and Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021).  The Duke Honduras Memo communicates the Acting Secretary's decision to allow Honduras's TPS designation to extend automatically while she continued to gather information and consider Honduras's eligibility, which is a final agency decision unto itself.  According to DHS's declaration, the redacted section of the memorandum

11

summarizes the Acting Secretary's "interaction[s] with other federal government agencies and DHS components that helped inform her decision."  2d Pavlik-Keenan Decl. ¶ 18.  Because the Secretary's written commentary on those interactions informed the final agency decision communicated in the memo, it is not predecisional.  Therefore, it lies beyond the ambit of the deliberative-process privilege.

However, "records generated after adoption of a particular agency policy may still be predecisional with respect to *other nonfinal agency policies*."  *Comptel*, 910 F. Supp. 2d at 121 (emphasis added) (citing *Jud. Watch v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006)).  The unredacted portions of the Duke Honduras Memo make clear that the Acting Secretary was still gathering information to inform her future decision on Honduras's TPS status.  In addition to the aforementioned consultations with other Executive Branch stakeholders, DHS claims that the redacted portion of the memo also contains the Acting Secretary's notice to her subordinates of "further action she wanted to take with the government of Honduras," 2d Pavlik-Keenan Decl. ¶ 18, and "DHS's continued relationship with the Honduras government that was *not used as a basis for her decision . . . .*"  Supplemental *Vaughn* Index (emphasis added).  In other words, the Acting Secretary did not mention DHS's relationship with the Honduran government because it informed the decision that the Secretary already made, but rather because it might be relevant to the *future* decision on Honduras's TPS designation that she had *yet to make*.  This is precisely the sort of predecisional content that the deliberative-process privilege is meant to protect.  DHS has also articulated how disclosing the Acting Secretary's evolving thought process would inhibit frank discussion of the complex factual and diplomatic considerations that inform TPS designations and discourage her from "provid[ing] candid advice and direction to Senior Leaders and staff" in the future.  *Id.*; Supplemental *Vaughn* Index.

Documented raises two counterarguments in support of disclosure.  First, Documented argues that deliberative-process privilege does not protect documents that originate from a superior and flow downward to her subordinates.  Pl.'s Mot. for Summ. J. 9 (citing *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980)).  But while it may be descriptively accurate that final opinions "typically flow from a superior with policy-making authority to a subordinate who carries out the policy," the D.C. Circuit has clarified that "[t]here is no . . . directional precondition to protection under the deliberative process privilege," and when "an internal agency dialogue is underway, communications by both the giver and the taker can fall within the privilege."  *Reps. Comm.*, 3 F.4th at 364.  Where, as here, the agency's decision-maker is providing a glimpse into her thought process with respect to a future decision, it makes little difference that the beneficiaries of that glimpse happen to be her subordinates.

Second, Documented argues that the deliberative-process privilege covers only information internal to the government, and does not encompass information gleaned from communications with third parties.  Pl.'s Mot. for Summ. J. 10 (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).  This argument misconstrues *Klamath*: Although a *document's* "source must be a Government agency" to be protected by deliberative-process privilege, *Klamath*, 532 U.S. at 8, it does not follow that all substantive information contained *within* such a document must also originate from an agency to be protected.  *Cf. Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (holding that deliberative-process privilege protects an agency's factual summaries that were "culled . . . from the much larger universe of facts presented to it" and which "reflect an exercise of judgment as to what issues are most relevant"); *see also Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 67 (D.C. Cir. 1974) (holding that a summary of publicly available

information created by an EPA staff member was protected by deliberative-process privilege); *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 84–85 (2d Cir. 1985) (holding that analyses of public information prepared by agency staff and outside consultants were protected by deliberative-process privilege).   Even if the redacted portion of the Duke Honduras Memo contains information received from third party stakeholders, such as the Honduran government, that fact would not by itself compel disclosure.[5]

That leaves only the matter of whether DHS complied with FOIA's segregability requirement.   If the improperly withheld material cannot reasonably be segregated from those portions that were properly withheld, then DHS is not required to disclose it.   DHS has asserted that it conducted a "page-by-page, line-by-line" review of the Duke Honduras Memo to separate and disclose non-exempt materials, 1st Pavlik-Keenan Decl. ¶ 19.   However, it did so under the erroneous belief that the Acting Secretary's comments on her consultations with other Executive Branch stakeholders were privileged.   Now that the Court has clarified that they are not, the Court will order DHS to either disclose the non-exempt information about consultations within the Executive Branch, or else file a supplemental affidavit explaining why that material cannot be segregated from the properly exempted content concerning DHS's relationship and future plans with the Honduran government.

## C.  DHS Failed to Articulate a Specific Harm from Disclosing the Somalia TPS Memo

Documented concedes that the Somalia TPS Memo is predecisional but argues that it should be at least partially unredacted because, by DHS's admission, it contains factual material.

---

[5] It appears that Documented may have advanced this argument based on a misunderstanding.  DHS's motion for summary judgment states that the withheld portions of the Duke Honduras Memo included "intelligence and advice from third parties," without specifying who those third parties are.  Def.'s Mot. for Summ. J. 16–17.  Documented may have understood DHS to be referring to non-governmental actors, but the declaration attached to DHS's reply clarifies that these "third parties" are, in fact, DHS components and other agencies.  2d Pavlik-Keenan Decl. ¶ 18.

Pl.'s Mot. for Summ. J. 10.  Moreover, although DHS claims that disclosure of the memo would cause reasonably foreseeable harm, Documented argues that DHS's proffered harms are too "generic," *id.* at 12, and that the agency has failed to specifically articulate "why *this* disclosure would be *particularly* harmful," as FOIA requires.  *Nat'l Pub. Radio, Inc. v. U.S. Dep't of Homeland Sec.*, 20-cv-2468-RCL, 2022 WL 4534730, at *8 (D.D.C. Sept. 28, 2022).  Finally, Documented argues that whatever harmful effect could come from disclosure has been blunted by civil discovery in recent Ninth Circuit litigation, which has revealed other DHS briefings related to Somalia's TPS status.  Pl.'s Mot. for Summ. J. 13–14; *see Ramos v. Wolf*, No. 18-16981, 975 F.3d 872 (9th Cir. 2020).  Documented is incorrect that the factual material contained within the Somalia TPS Memo is ineligible for protection under the deliberative-process privilege.  However, Documented is correct that DHS has not met its burden to specifically articulate a reasonably foreseeable harm that would transpire if the Somalia TSP memo were disclosed in full, so the memo must be disclosed.

Regarding Documented's first argument, "[i]t is well-established that the deliberative process privilege generally does not shield purely factual information from disclosure." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 159 (D.D.C. 2009) (citing *Jud. Watch., Inc. v. Dep't of Just.*, 365 F.3d 1108, 1113 (D.C. Cir. 2004)). However, factual information may be withheld under the deliberative-process privilege if it is "so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations," *In re Sealed Case*, 116 F.3d 550, 558 (D.C. Cir. 1997), or if "the manner of selecting or presenting those facts would reveal the deliberate process . . . ." *Ryan v. Dep't of Just.*, 617 F.2d 781, 790 (D.C. Cir. 1980).  Relevant here, "factual material . . . assembled through an exercise of judgment in extracting pertinent material

from a vast number of documents for the benefit of an official called upon to take discretionary action" is protected from disclosure under the deliberative-process privilege. *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993); *see also Montrose Chem. Corp.*, 491 F.2d at 71 (holding that "summar[ies] of factual material on the public record" for "use in making a complex decision" are "exempt from disclosure under exemption 5 of FOIA"). In its declarations and *Vaughn* index, DHS depicts the Somalia TPS Memo as a curated collection and synthesis of factual materials and a discussion of how those facts relate to the agency's legal obligations and policy priorities. Content such as this is eligible for protection under the deliberative-process privilege.

However, the analysis is not over once a document has been deemed predecisional and deliberative; the agency must also explain, with reasonable specificity, how its disclosure would lead to a reasonably foreseeable harm to an interest protected by Exemption 5. *Nat. Pub. Radio*, 2022 WL 4534730, at *7. DHS claims that, if agency personnel are afraid to provide their candid, expert assessments of country conditions to the Secretary, his ability to competently render the complex and fact-intensive decisions underlying TPS designations will suffer. 2d Pavlik-Keenan Decl. ¶ 23; 1st Pavlik-Keenan Decl. ¶ 24. This is exactly the sort of harm that the deliberative-process privilege means to prevent. *See Cofield v. City of LaGrange*, 913 F. Supp. 608, 615 (D.D.C. 1996) (explaining that the deliberative-process privilege is intended to "encourage open, frank discussions within the agency" and "protect against premature disclosure of proposed policies" so as to "avoid chilling the decisionmaking process").

But DHS's logical chain is missing a link. It has explained why good TPS memos are important to good policymaking, and it has explained why a lack of candor may produce bad TPS memos. Crucially, however, DHS has not explained why the disclosure of documents like

the Somalia TPS Memo would cause agency personnel to shrink from expressing their views candidly.

As a general matter, "those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests . . . ." *United States v. Nixon*, 418 U.S. 683, 705 (1974). But this truism, standing alone, is not an adequate justification for claiming the protection of the deliberative-process privilege. *Reps.' Comm.*, 3 F.4th at 370 (holding that "a 'perfunctory state[ment] that disclosure of all the withheld information . . . would jeopardize the free exchange of information between senior leaders within and outside the [agency]' will not suffice") (quoting *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018)). If the Court were to credit the agency's bare claim that any disclosure of intra-agency communications risks chilling open dialogue, the "foreseeable harm" requirement would be reduced to a triviality. *See Jud. Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp. 3d 93, 101 (2019). Instead, the agency must show, with reference to "the specific information contained in the material withheld," not just that the challenged disclosure "*could* chill speech," but that "it is reasonably foreseeable that it *will* chill speech . . . ." *Id.* (emphasis added).[6] In sum, DHS's "boilerplate, unparticularized, and hypothesized assertion[s]" about the risk of chilling intra-agency discussions are insufficient to avoid disclosure under FOIA, *Reps. Comm.*, 3 F.4th at 371, so the Somalia TPS Memo must be disclosed.[7]

---

[6] It is true that, "in the absence of a focused and concrete agency explanation, the Court may nonetheless find that the foreseeable harm requirement is satisfied based on the 'context and purpose' of the withheld information." *Friends of the River v. U.S. Army Corps of Eng'rs*, No. 16-cv-2327-JMC, 2023 WL 4105168, at *4 (D.D.C. June 21, 2023). But DHS has not provided the Court with any contextual information to support such a finding. DHS has not, for example, asserted that the memo concerns a particularly "high-profile matter" which may place agency personnel uncomfortably in the limelight, *cf. Keeping Gov't Beholden, Inc. v. Dep't of Just.*, No. 17-cv-1569-FYP, 2021 WL 5918627, at *10 (D.D.C. Dec. 13, 2021), nor that they arose in a "sensitiv[e] . . . context" in which the "need for confidentiality" is manifest. *Cf. Reps. Comm*, 3 F.4th at 372.

[7] Because the agency has failed to proffer a foreseeable harm of disclosure, the Court need not address Documented's final argument, namely that disclosure would be harmless because other DHS documents relating to

**D.  The MPP Memo Is Protected by the Deliberative-Process Privilege**

The final document at issue is the MPP Memo.  There is no dispute that this memo, which presents the Acting Secretary with alternative options for managing two MPP facilities, is predecisional.  Nevertheless, Documented argues that the memo should be unredacted, first because the redacted options detailed in the memorandum constitute non-exempt factual material; second, because the redacted paragraph explaining why a Secretary-level signature is required is a "quotidian explanation of the existing law," rather than a deliberation; and third, because DHS has not articulated a foreseeable harm that would result if the redacted list of options were disclosed.  Pl.'s Mot. for Summ. J. 16–17.  The Court disagrees on each score and concludes that DHS properly invoked the deliberative-process privilege to justify its redactions.

First, alternative courses of action that an agency may take in the future may be withheld under the aegis of the deliberative-process privilege.  *See Jordan v. U.S. Dep't of Just.*, 591 F.2d 753, 772 (D.C. Cir. 1978) (en banc) (holding that the deliberative-process privilege "protects . . . candid consideration of alternatives within an agency"); *Klamath*, 532 U.S. at 8 (holding that the privilege encompasses "documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which governmental decisions and policies are formulated") (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  Documented's theory—that the privilege shields the discussion of an agency's options, but not the content of the options themselves—is incompatible with precedent in this Circuit.  *See, e.g.*, *Krikorian v. Dep't of State*, 984 F.2d 461, 466 (D.C. Cir. 1993) (holding that two proposed

---

Somalia's TPS status have been disclosed in the *Ramos* litigation.  But it suffices to say that, although "an agency cannot rely on a FOIA exemption to withhold information if it is in the public domain . . . '[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain.'"  *Kendrick v. FBI*, No. 20-cv-2900-TNM, 2022 WL 4534627, at *5 (D.D.C. Sept. 28, 2022) (emphasis in original) (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)).  That is, apparently, not the case here.

options for replying to public inquiries about a State Department publication were protected by the deliberative-process privilege); *Shapiro v. Dep't of Just.*, No. 12-cv-313-BAH, 2020 WL 3615511, at *43 (D.D.C. July 2, 2020) (Howell, C.J.) (upholding an agency's choice to withhold a document containing "alternative avenues of action available in [an] investigation" and a discussion of those alternatives).

Second, Documented's argument that the redacted signature-level justification paragraph is nothing more than a "quotidian explanation of the existing law" entirely ignores DHS's stated reason for withholding it. DHS represents that the redacted paragraph contains the "preferred recommended action" that the memo's drafter advises the Secretary to take with respect to the two MPP facilities. 2d Pavlik-Keenan Decl. ¶ 16. Such an "advisory opinion[]" or "recommendation[]" goes to the very core of what the deliberative-process privilege means to shield from public scrutiny. *Klamath*, 532 U.S. at 8.

Third, DHS has provided the Court with a sufficiently particularized articulation of the foreseeable harms likely to result from disclosure. Unlike the Somalia TPS Memo, DHS claims that the MPP Memo concerns a "highly controversial and sensitive" government initiative, an assertion corroborated by the abundance of litigation surrounding the MPP program. 2d Pavlik-Keenan Decl. ¶ 15. And although the MPP itself may never be re-implemented, DHS plausibly suggests that the agency will likely have to make similar "[d]ecisions regarding immigration hearing infrastructure" in the future. 1st Pavlik-Keenan Decl. ¶ 15. It is reasonably foreseeable that if agencies are forced to divulge memoranda that identify and analyze potential courses of action related to highly controversial programs, agency personnel tasked with such analyses may be less inclined to put their opinions into writing candidly, if at all. And it stands to reason that

depriving decision-makers of high-quality written memoranda will "result in less informed decisions," *id.*, a harm that the deliberative-process privilege is intended to prevent.

Finally, DHS asserts that it has conducted a "page-by-page, line-by-line review" of the MPP Memo and released all reasonably segregable non-exempt material to Documented. 1st Pavlik-Keenan Decl. ¶ 16. Documented has proffered no reason for skepticism of DHS's claim that it has made an adequate, good faith effort to comply with FOIA's segregability requirement, a presumption to which DHS is entitled. *Boyd*, 475 F.3d at 391. The fact that large parts of the memo are unredacted—e.g., the identities of the senders and recipients, as well as the memo's sections on "purpose," "background," and "timeliness"—buttresses this conclusion. MPP Memo 2. DHS therefore properly redacted the MPP memo pursuant to the deliberative-process privilege.

## IV.    CONCLUSION

With respect to the Duke Honduras Memo, the Court will **GRANT** DHS's motion for summary judgment as to its redaction of the Acting Secretary's discussion of the agency's relationship and future plans with the government of Honduras, and **DENY** Documented's motion for summary judgment as to the same. However, the Court will **DENY** DHS's motion for summary judgment as to its redaction of the Acting Secretary's commentary on her consultations with DHS components and other agencies. The Court will separately **ORDER** DHS to either disclose to Documented the non-exempt portions of its redaction, or else file a supplemental affidavit explaining why the non-exempt redacted material cannot reasonably be segregated from the exempt redacted material.

With respect to the Somalia TPS Memo, DHS has failed to specifically articulate a foreseeable harm likely to result from the disclosure of this memorandum. Therefore, the Court will **GRANT** Documented's motion for summary judgment as to this document and **DENY**

DHS's motion as to the same. The Court will separately **ORDER** DHS to disclose in full an unredacted version of this record.

Finally, with respect to the MPP Memo, DHS has properly redacted this document pursuant to the deliberative-process privilege as enshrined in FOIA Exemption 5. Therefore, the Court will **GRANT** DHS's motion for summary judgment as to this document and **DENY** Documented's motion as to the same.

Date: September ___20___, 2024

Royce C. Lamberth
United States District Judge